IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2014

**IN RE RA'NIYAH T.**

**Appeal from the Juvenile Court for Shelby County**
**No. W8337      Dan H. Michael, Special Judge**

_____

**No. W2014-00680-COA-R3-JV - September 5, 2014**

_____

This is a child custody and visitation case. After protracted litigation, and the entry of several temporary orders on visitation, the trial court implemented a permanent custody and visitation schedule. Appellant/Mother appeals the trial court's designation of Appellee/Father as the child's primary residential parent, and also appeals the trial court's award of Father's attorney fees. Discerning no error, we affirm. Affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Rosalind E. Brown, Memphis, Tennessee, for the appellant, Joscelyn A.T.

George Michael Casey, Jr., Jackson, Tennessee, for the appellee, Roy L. T.

**MEMORANDUM OPINION**[1]

_____

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion

1

The minor child at issue in this case, Ra'Niyah T., was born in March of 2010. The Appellant Joscelyn A.T. ("Mother") is the child's mother; Appellee Roy L. T. ("Father") is the child's father.[2] The parties lived together briefly after the child's birth in Henderson, Tennessee. Father's parents were involved in helping the parties secure housing. In addition, Father's parents helped care for the child and also helped the parties by providing meals. Father's mother and Mother did not, however, get along. When the child was approximately five months old, Mother left Henderson and moved to Memphis, where she currently resides with the child in her grandmother's home. Father continues to live in Henderson with his parents.

The case was first brought before the Juvenile Court of Shelby County upon a petition for child support. The Title IV-D petition for child support was filed against Father on May 28, 2010 by the State of Tennessee, *ex rel.* Mother. The State's petition was heard on July 12, 2010 before the Juvenile Court Magistrate. The Magistrate's findings and recommendations were entered on July 28, 2010. Therein, the Magistrate found that Father acknowledged his obligation to support the child. Accordingly, Father was ordered to pay $297.00 per month in child support. The findings and recommendations of the Magistrate were adopted, ratified, and confirmed as the order of the Juvenile Court on September 13, 2010. No visitation was set at that time, and the child remained with Mother.

On October 13, 2011, Father filed a petition for visitation with the child. This petition was also heard by the Juvenile Court Magistrate on March 8, 2012. Following the hearing, the Magistrate entered findings and recommendations on March 27, 2012. Therein, the Magistrate recommended that Father be awarded visitation with the child every Sunday for four hours. In addition, Father was granted visitation with the child on the child's birthday. The case was referred to mediation "so as to allow time for a medical re-evaluation of the child, the child's heart condition, and any restrictions that condition may place on the child's travel."[3] The Magistrate's findings and recommendations were confirmed as the order of the

---

would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] In cases involving minor children, it is this Court's policy to redact names to protect the children's identity.

[3] The child's medical history is not elaborated in the record. Mother testified that the child was born with "holes" in her heart. We glean from further testimony that the child has improved to the point of needing only routine medical examinations. At any rate, the child's medical condition was not a deciding factor in the custody determination.

trial court on March 26, 2012.

On January 24, 2013, Father filed an amended petition for custody and/or visitation, wherein he averred that there had been a material change in circumstances. Specifically, Father alleged, *inter alia*, that Mother had willfully refused to abide by the previous order on visitation by failing to provide the child for visitation, and/or by failing to appear for said visitation. Father further averred that Mother had "attempted to alienate the parties' child from [Father]." Based upon these allegations, Father asked the court to award him custody of the child, or, in the alternative, to grant more liberal visitation. While Father's amended petition was pending, the Magistrate recommended that Father's visitation with the child be increased to the "first, third and fifth weekend of each month," and that the Father should pick the child up at Mother's home. These recommendations were confirmed as the order of the trial court on or about May 16, 2013.

On June 13, 2013, the Magistrate entered further findings and recommendations, including that Father would be granted an extra overnight visit with the child, and would also receive additional summer visitation privileges. In addition, the parties were ordered to exchange the child at a specified location. These findings were also incorporated and confirmed as the order of the trial court on or about June 11, 2013.

On August 9, 2013, Father filed a petition for contempt against Mother, alleging that she had failed to comply with the court's orders on visitation. Thereafter, Father's attorney was granted leave to withdraw from the case, and the matter was continued.

Father's amended petition for custody and/or visitation was ultimately heard by the Magistrate. On September 6, 2013, the Magistrate entered findings and recommendations, including: (1) dismissal of Father's initial petition for visitation filed on October 13, 2011; (2) dismissal of Father's petition for contempt; (3) recommendation that Father and Mother be awarded joint-custody of the child, with the parties alternating physical custody of the child every three months; (4) recommendation that Mother be granted visitation with the child while the child is in Father's physical custody; (5) recommendation that Father be granted visitation with the child while the child is in Mother's physical custody; and (6) recommendation that Father be responsible for pick up and return of the child to Mother during both parties' scheduled visitations. The Magistrate's findings and recommendations were confirmed and adopted as the court's order on or about September 5, 2013. Following entry of the order, Father requested a hearing before the Juvenile Court by petition filed on September 5, 2013. The petition was granted, but the matter was continued until February 24, 2014.

3

On February 24, 2014, Father's petition was heard by the Juvenile Court.[4]  By order of February 24, 2014, the trial court held, in relevant part, as follows:

> [U]pon proof introduced and the entire record, the Special Judge finds that the Petition for Visitation filed in this Court on October 13, 2011, should be dismissed.  The Court further finds that the mother of said child . . . willfully and intentionally failed to appear timely and on numerous occasions for the father's scheduled visitation.  Additionally, the mother did not allow the father to have contact with said child and ignored the best interest of said child to have a relationship with the father; therefore, the Amended Petition for Custody and/or Visitation filed in this Court on January 24, 2013 and the Petition for Contempt filed in this Court on August 9, 2013 should be sustained.
>
> **IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED**
>
> 1.  That the Petition for Visitation filed in this Court on October 13, 2011 be and is hereby dismissed.
> 2.  That joint custody of said child be and is hereby awarded to the father . . . and mother . . . with the father being the primary residential custodian.

In addition to the foregoing, the court set Mother's visitation privileges, dictated the terms of exchange of the minor child for purposes of visitation, and ordered Mother to pay Father's attorney's fees.

Mother appeals; she raises four issues for review as stated in her brief:

> 1.  Whether the trial court erred in finding that a material change had occurred?
>
> 2.  Whether the trial court erred in designating [Father] as [the] primary residential parent for the minor child?
>
> 3.  Whether the trial court erred in awarding attorney's fees to

---

[4] The case was heard by Special Judge Dan H. Michael.

4

[Father]?

    4. Whether this Court should award attorney's fees to Mother?

In the posture of Appellee, Father also asks this Court to award his attorney's fees and costs expended in defense of this appeal.

**Applicable Standard of Review**

We note at the outset that because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Tenn. R. App. P. 13(d). Questions of law are reviewed *de novo* with no presumption of correctness. *Id*.

Before turning to the substantive issues, we first address a point of dispute between the parties concerning whether the order appealed constitutes an initial custody determination, or whether it constitutes a modification of an existing custody determination. Mother contends that the trial court erred in finding that a material change in circumstances had occurred so as to warrant modification of the existing visitation schedule. Father, on the other hand, contends that the orders leading up to the February 24, 2014 order were all temporary orders on visitation. Consequently, he asserts that the final order was, in fact, an initial custody determination and that he was not required to show a material change in circumstances. The distinction between the parties' respective arguments is important because it dictates the applicable standard of review used by this Court in reviewing the trial court's determinations.

It is well settled that "[a] custody decision, once final, is *res judicata* upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 193 Tenn. 480, 246 S.W.2d 93, 95 (Tenn. 1952)); *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, because children's and parents' circumstances change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." *Scofield*, 2007 WL 624351, at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)); *see also Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995)). Accordingly, if Mother is correct that this appeal arises from a modification of an existing custody or visitation arrangement, our review is governed by Tennessee Code Annotated Section 36-6-101. Pursuant to that statute, modification of an existing custody arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B)–(C); see also *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). First, the parent attempting to modify the existing custody or visitation arrangement

must prove, by a preponderance of the evidence, that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B)–(C); *see also* **Taylor v. McKinnie**, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing **Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002)). To determine whether a material change in circumstances has occurred, the court should consider whether: "(1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered; and (3) the change is one that affects the child's well-being in a meaningful way." **Kendrick**, 90 S.W.3d at 570; *see also* **Blair v. Badenhope**, 77 S.W.3d 137, 150 (Tenn. 2002).[5]

---

[5] We note that the determination of whether a "material change of circumstances" has occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B)–(C); *see also* **Pippin v. Pippin**, 277 S.W.3d 398, 406–07 (Tenn. Ct. App. 2008) (citing **Massey–Holt v. Holt**, 255 S.W.3d 603 (Tenn. Ct. App. 2007)). In pertinent part, Tennessee Code Annotated Section 36-6-101(a)(2)(B)–(C) provides:

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

> * * *

> (C) If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

As previously stated by this Court, "a 'change in circumstance' with regard to the parenting schedule is a distinct concept from a 'change in circumstance' with regard to the identity of the primary residential

If the petitioner makes a *prima facie* case for a material change in circumstances, then the court must determine whether a change in custody or visitation is in the best interest of the child. *In re J.C.S.*, No. M2007-02049-COA-R3-PT, 2008 WL 2924982, at *6 (Tenn. Ct. App. July 28, 2008). This determination requires consideration of a number of factors, including those set forth at Tennessee Code Annotated Section 36-6-106(a) to make an initial custody determination, *see infra*, and those set forth at Tennessee Code Annotated Section 36-6-404(b) to fashion a residential schedule. *Id*.

However, if, as Father argues, the trial court's order merely sets forth an initial custody and visitation schedule, no material change in circumstances must be shown. Instead, our review is governed by Tennessee Code Annotated Section 36-6-106, which provides:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)–(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors . . . .

Tenn. Code Ann. § 36-6-106 (discussing several factors the court should consider, as discussed in detail, *infra)*.

In initial custody and visitation decisions, "[t]rial courts are vested with wide discretion . . . and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct.12, 2010) (citing *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Because "[c]ustody and visitation determinations often hinge on

---

parent." *Massey–Holt*, 255 S.W.3d at 607. Subsection (a)(2)(C) establishes a lower threshold for modification of a residential parenting schedule. *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2, n.3 (Tenn. Ct. App. Aug. 18, 2006) (holding that Tenn. Code Ann. § 36-6-101(a)(2)(C) "sets a very low threshold for establishing a material change of circumstances")).

subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." **Hyde**, 2010 WL 4024905, at *3 (citing **Johnson**, 169 S.W.3d at 645). Accordingly, appellate courts review a trial court's decision regarding which parent to name as the primary residential parent for an abuse of discretion. *See* **Fulbright v. Fulbright**, 64 S.W.3d 359, 365 (Tenn. Ct. App. 2001) (citation omitted); *see also* **Porter v. Porter**, No. M2012-00148-COA-R3-CV, 2013 WL 313838, at *14 (Tenn. Ct. App. Jan. 15, 2013) (Kirby, J., concurring) (declining to reverse the trial court's ruling only because of the "high standard" required under abuse of discretion review). "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" **Curtis v. Hill**, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting **Eldridge v. Eldridge**, 42 S.W.3d 82, 88 (Tenn. 2001)). Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See* **Eldridge**, 42 S.W.3d at 88. As our Supreme Court has explained:

> When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving [parental responsibilities], to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See* **State v. Franklin**, 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf.* **State v. Pappas**, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); **Bradford v. Bradford**, 51 Tenn. App. 101, 364 S.W.2d 509, 512–13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g.,* **State ex. rel Vaughn v. Kaatrude**, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Eldridge*, 42 S.W.3d at 88. The trial court's discretion, however, is not unbounded. *Hogue*, 147 S.W.3d at 251 (citation omitted). The court must base its decision upon proof and apply the appropriate legal principles. *Id.* (citation omitted).

"By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004)). "In choosing which parent to designate as the primary residential parent for the child, the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. 1983)). "In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a)." *Ellis*, 211 S.W.3d at 286 (footnote omitted). While "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination," the statute nevertheless "requires the trial court to consider all the applicable factors." *Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept.28, 2010). Moreover, this Court has encouraged trial courts to "be as precise as possible in making child custody findings" in order to facilitate meaningful appellate review. *In re Elaina M.*, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8 (Tenn. Ct. App. Oct. 25, 2011).

From its statements at the hearing, i.e., "as far as custody is concerned, the Court has to look at numerous things. [Tenn. Code Ann. §]36-6-106 is the statute concerning child custody," the trial court clearly applied the Tennessee Code Annotated Section 36-6-106 standard for initial custody and visitation determinations. The trial court further acknowledged that all of the orders on visitation, leading up to the February 24, 2014 hearing were temporary, i.e., "[e]ssentially, we're back on the temporary order on [Father's] petition to visit. . . ." Even Mother's own attorney acknowledged at several points in the record that, at the time of the hearing, the parties were operating under a temporary order concerning visitation. For example, Mother's attorney stated, "Your Honor, there is a temporary order in place that allows the [F]ather visitation with the child every other weekend . . . ." Mother's attorney also indicated that her client was seeking a permanent order on visitation: "And what you're [i.e., Mother] asking the Court today is to grant the standard visitation schedule or to **make the temporary order a permanent order** regarding the schedule of visitation."

From March 23, 2011 until February 24, 2014, the parties appeared before the trial court eleven times. The trial court, in its statements from the bench contained in the transcript

of the hearing, acknowledged the protracted procedural history, noting that the prior orders on visitation were all temporary in nature:

> This case began with a petition for child support filed back in 2010. . . . Support was eventually set. [F]ather . . . came in and filed his petition for visitation October 13, 2011 . . . .
>
> There was an order entered March 23, 2012. He was granted parenting time. The parties were referred to mediation, and there was some concern about the child's medical status. That order was entered by agreement and it was continued for the medical reevaluation of the child and restrictions on travel. It came before the court. It got continued a second time, a third time.
>
> [F]ather then filed an amended petition for custody and/or visitation on January 24, 2013, asking for custody and/or liberal visitation claiming the mother was interfering with his relationship. That got continued one, two, three times. At one continuance, he got **temporary** visitation privileges the first, third and fifth weekends. Came back in. He got overnight parenting time and got continued again.
>
> **So, we're still on that original temporary order** when he filed his petition for contempt. It got continued again. It got struck from the docket, and it eventually came to trial September the 5th of 2013. All tight. The petition for visitation filed on October 13, 2011, was dismissed. The contempt petition was dismissed. . . .
>
> Joint custody was awarded to the parents. The parents, they alternated physical custody of the child[] . . . .
>
> \*                               \*                               \*
>
> **Essentially, we're back on the temporary order on his petition to visit back in 2012**. We need to hear . . . all that . . .and that way **we can resolve the matter once and for all**.

(Emphases added).

10

From the foregoing statements, and from the record, we conclude that the instant case is inversely analogous to the case of ***Dillard v. Jenkins***, No. E2007-00196-COA-R3-CV, 2007 WL 2710017 (Tenn. Ct. App. Sept. 18, 2007). In ***Dillard***, we held that:

> It is clear upon reading the Temporary Order that the order was not intended to be a final adjudication of custody. The document contains repeated references to its temporary nature and the fact that the trial court would have a final hearing at a later date. Although the trial court may not have intended to leave the custody issue open for future adjudication, the trial judge did in fact sign the Temporary Order. As we have acknowledged numerous times, "No principle is better known than that which states that a Court speaks through its orders and decrees entered upon the minutes of the Court ." ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App.1977). Therefore, we conclude that the Temporary Order entered on April 21, 2003, was, as its name implies, temporary in nature, and that the trial court did not make a permanent custody determination at that time. This finding prompts the necessary conclusion that the trial court applied an incorrect standard during the September 27, 2006, hearing. Instead of considering the matter as a request for modification of custody, the trial court should have heard the matter as an initial custody determination. As a result, we must reverse the trial court's custody decision and remand this matter to the trial court so that Father's petition for custody may be decided under the proper legal standard. . . .

***Id***. at *4. Although the intermediate orders in ***Dillard*** used the term "temporary" to describe the custody arrangements preceding the final hearing, here the intermediate orders do not specifically state that the custody arrangements contained therein are temporary. However, as discussed by the trial court, *supra*, each of the intermediate orders left the custody and visitation arrangement open pending further hearing, evaluation, or mediation. Accordingly, we conclude that the trial court correctly treated the case as an initial custody determination, and, therefore, correctly applied the standard set out at Tennessee Code Annotated Section 36-6-106, *supra*. The substantive question, then, is whether the record supports the trial court's custody determination in light of those factors set forth in the statute. Before addressing this question, as a point of practice, we first note a shortcoming in the trial court's order.

Although the trial court's statements from the bench clearly indicate that it applied the correct standard in this case, the court's order does not specifically reference or discuss the

11

best interest standards set out at Tennessee Code Annotated Section 36-6-106(a)(1) through (10). Rather, the court's order states only that the Mother "willfully and intentionally failed to appear timely and on numerous occasions for the father's scheduled visitation," and that Mother "did not allow the father to have contact with said child and ignored the best interest of said child to have a relationship with the father. . . ." Although, as noted *infra*, the trial court clearly applied the statutory factors in its oral statements from the bench, the law in Tennessee is well-settled that "the court speaks through its order, not through the transcript," so appellate courts "do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks." *Cunningham v. Cunningham*, No. W2006-02685-COA-R3-CV, 2008 WL 2521425, at *4–5 (Tenn. Ct. App. June 25, 2008) (quoting *Shelby v. Shelby*, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985)).[6]

This Court has encouraged trial courts to "be as precise as possible in making child custody findings" in order to facilitate meaningful appellate review. *In re Elaina M*., No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8 (Tenn. Ct. App. Oct. 25, 2011). Furthermore, we have expressed concern that the case law holding that trial judges need not articulate the factors pursuant to Tennessee Code Annotated Section 36-6-106(a) appears to conflict with the intent of Tennessee Rule of Civil Procedure 52.01, which provides:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

---

[6] The Court in *Cunningham* explained:

> A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor. A judge may modify, reverse, or make any other change in his judgment that he may deem proper, until it is entered on the minutes, and he may then change, modify, vacate or amend it during that term, unless the term continues longer than thirty days after the entry of the judgment, and then until the end of the thirty days.

*Cunningham v. Cunningham*, No. W2006-02685-COA-R3-CV, 2008 WL 2521425, at *4–5 (Tenn. Ct. App. June 25, 2008) (quoting *Broadway Motor Co., Inc. v. Fire Insurance Co.*, 12 Tenn. App. 278, 280 (1930)); *see also Ragland v. Morrison*, No. W2013-00540-COA-R3-CV, 2013 WL 4805624, at *3 (Tenn. Ct. App. Sept. 10, 2013).

*See In re Elaina M.*, 2011 WL 5071901, at \*8 n. 13. Prior to July 1, 2009, trial courts were only required to make specific findings of fact and conclusions of law "upon request made by any party prior to the entry of judgment." *See Poole v. Union Planters Bank N.A.*, No. W2009-01507-COA-R3-CV, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010) (noting the amendment). However, the current version of Rule 52.01 requires the court to make these findings regardless of a request by either party. *Id*. This Court has previously held that the requirement to make findings of fact and conclusions of law is "not a mere technicality ." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at \*8 (Tenn. Ct. App. May 15, 2009). Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id.*; *White v. Moody*, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at \*8 (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at \*19 (Tenn. Ct. App. April 21, 2004)). Accordingly, the better practice would have been for the trial court to either incorporate its oral findings into its order by reference, or for the trial court to enumerate its findings *vis* the Tennessee Code Annotated Section 36-6-106 factors in its order.

Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law is to "vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law." *Lake v. Haynes*, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at \*1 (Tenn. Ct. App. June 9, 2011). However, this Court has indicated that we may "soldier on" with our review despite the trial court's failure to make sufficient findings of fact and conclusions of law, in certain limited circumstances:

> On occasion, when a trial judge fails to make findings of fact and conclusions of law, the appellate court "may 'soldier on' when the case involves only a clear legal issue, or when the court's decision is 'readily ascertainable.'" *Hanson v. J.C. Hobbs Co., Inc.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at \*10 (Tenn. Ct. App. Nov. 21, 2012) (quoting *Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, at \*4 (Tenn. Ct. App. Aug. 28, 2012)).

*Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at \*5 (Tenn. Ct. App. Feb. 22, 2013). Here, although they are not incorporated into its order, the trial court did make some findings of fact from the bench with regard to the statutory factors. Thus, the trial court's reasoning concerning its custody and visitation decision is "readily ascertainable" from the record. *Pandey*, 2013 WL 657799, at \*5. Accordingly, we will exercise our discretion

13

to consider the substantive issues raised in this appeal despite the lack of written findings in the order before us.

### Custody and Visitation

We have consistently noted that a trial court's determinations on matters of child custody are "'among the most important decisions confronting a trial court . . . .'" ***Chaffin v. Ellis***, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (quoting ***Rice v. Rice***, No. M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn. Ct. App. July 19, 2001)). The paramount consideration is the needs of the child; "the desires of the parents are secondary." ***Id***. When deciding which parent to designate as the primary residential parent, the trial court must conduct a "comparative fitness" analysis. This analysis requires the court to determine which of the parents would be comparatively better fit to be the primary residential parent in light of the factors set forth in Tennessee Code Annotated § 36-6-106. ***Id***. (citing ***Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn. 1983)). This is a fact-driven inquiry, and the trial court must take all of the facts and circumstances of the case into consideration. ***Id***. (citing ***Nichols v. Nichols***, 792 S.W.2d 713, 716 (Tenn. 1990), *overruled on other grounds*, 924 S.W.2d 623 (Tenn. 1996)). In reviewing the trial court's custody and visitation determination, we consider each of the applicable factor contained in Tennessee Code Annotated Section 36-6-106(a), *supra*, along with the trial court's findings and the evidence contained in the record.

In its statements from the bench, the trial court first noted the overarching consideration, under Tennessee Code Annotated Section 36-6-106, i.e., "a custody determination regarding a minor child . . . shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child." Specifically, the court stated:

> And taking into account the child's best interest, the Court shall order a custody arrangement that permits both parents–both parents. Not "my baby," not "my baby," not "my baby," as you [i.e., Mother] repeated–I counted 12 times during your testimony–but both parents. "Shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child."

With this goal in mind, the court then turned to address the specifically applicable best interest factors set out at Tennessee Code Annotated Section 36-6-106(a)(1) through (10).
**(1) The love, affection and emotional ties existing between the parents or caregivers and the child; . . . .**

14

Concerning this factor, the trial court stated, in relevant part:

> I don't discount that you [i.e., Mother] love your daughter, but you're loving your daughter to the exclusion of her father's ability to establish a [] loving relationship. You have consistently thwarted this Court's order to prevent him from having a connection with this child, and she's almost 4 years old. He also testified that when she is with him she's affectionate and loving, those few times he got to see her over the last 4 years.

The record supports the trial court's statements in that it is clear that both parents love this child. As discussed in detail below, Father travels two-hours one-way to visit with his daughter, and has gone through protracted litigation to secure his visits. There is no indication that Mother does not love this child; however, as the trial court points out, Mother's love for the child is manifest in her exclusion of Father from the child's life. This is not the goal of Tennessee Code Annotated Section 36-6-106, which is to accomplish a visitation and custody arrangement "that permits both parents to enjoy the maximum participation possible in the life of the child." On the other hand, Father testified that, although he wants to be the child's residential parent, he also wants the child to have a relationship with Mother. From the totality of the circumstances, we conclude that this factor weighs in favor of Father.

**(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver; . . . .**

The trial court specifically found that "there is no evidence here that either parent is failing [on this factor]. From the record, we see nothing to dispute the trial court's finding that both parents are willing and able to provide the child with all necessaries, nor do we find anything in the record to indicate that either parent has failed to provide for this child.

Father testified that the home where Mother lives is not clean, based upon his testimony that he saw a roach crawling on the wall when he was at Mother's to reprieve the child. In addition, Father testified that the child had come to visitation with "bed bug bites" on her legs. There were, however, no photos or corroborating testimony in the record. Mother disputes these allegations.

Father's mother testified that, at one visitation

> when [Mother] gave the baby over, she didn't bring her a change of clothes, diapers, anything, nothing, and [the child] was

15

soaking wet. I put her up against me, and this is a picture [depicting paternal grandmother's shirt with what appears to be a wet spot on the front] of how soaked she was because she wet through my shirt.

This testimony was undisputed in the record.

Concerning Father's living arrangement, as noted above, he is currently living in the home with his parents. Both of his parents testified that they would welcome the child into their home, and that she has a bedroom. Photos, admitted into evidence, show the child's room at the Father's house, as well as some of her toys. Father testified that he works at a tire plant in Henderson. However, Father's mother testified that she is retired and is willing and able to help with the child's care while Father is at work. Photos, admitted into evidence, show the child hugging her paternal grandparents, and it appears that the child is comfortable with Father's parents.

Mother also works full time at Federal Express. She works both day and night shifts. Mother testified that the child is currently enrolled in daycare, which she attends from 6:00 a.m. to 3:00 p.m. Concerning Mother's support network, there is no evidence in the record to suggest that Mother's family is actively involved in caring for the child. At any rate, the child will start school soon (she was almost four at the time of the hearing). Father testified that he has inquired about schools in Henderson and that he is familiar with the system there. From the totality of the circumstance, we conclude that this factor weighs slightly in favor of Father.

**(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . . .**

On this factor, the court noted that "there's no argument that the child has not lived in a stable environment, whether it was satisfactory or not, the Court finds that [Mother] would not allow [the child] contact with her father." Other than Mother's continuing resistance to Father's visitation, there is really no indication that either of the parties' homes is unstable or unsuitable for the child. Although the child has lived with Mother, she has had contact with her Father and his family throughout her young life. Accordingly, this factor does not weigh in favor of either party.

After examining the first three factors, the trial court then specifically noted that factors (4) through (9) were not specifically applicable, given the particular circumstances presented in this case. Given the child's young age, and the evidence in the record, we agree that these factors are not applicable to this particular case. The court then turned to factor (10).

16

**(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.**

Concerning this factor, the trial court stated:

> This Court makes a specific finding today that you [i.e., Mother] are ignoring your daughter's best interest by alienating her affections from her father by refusing to let him visit.

Turning to the record, Father kept contemporaneous notes concerning Mother's failure to provide the child for his scheduled visitations. With the aid of these records, Father testified that he was awarded temporary visitation with his daughter, beginning in March 2012, every Sunday from 12:00p.m. until 4:00 p.m. Father testified that he would show up for these visitations at the arranged place, but Mother would often fail to arrive with the child. In addition, Father testified that, when Mother did show up, she was often late, or in the company of others who interfered with his visitation. Specifically, Father testified that:

- March 1, 2012– Father was scheduled to have visitation from 12:00 p.m. to 4:00 p.m, but Mother arrived one hour and fourteen minutes late.
- March 11, 2012– Father was supposed to have visitation. On that occasion, Father stated that Mother arrived thirty-four minutes late, with two other females, each of whom brought a baby with her, and that this fact disrupted his visitation with the child.
- March 17, 2012– Father was again scheduled for visitation, but Mother arrived forty-five minutes late, and again brought the two other females with her.
- March 18, 2012, Mother failed to bring the child for visitation.
- March 25, 2012– Father's visitation was scheduled to begin at 12:00 p.m.; Mother did not arrive until 12:54 p.m.
- April 8, 2012– Father was scheduled to visit with the child until 4:00 p.m.. Although Mother arrived on time for this visit, Father testified that she left with the child at 3:00 p.m.
- April 15, 2012– Mother arrived for Father's 12:00 p.m. visitation at 1:06 p.m.
- April 22, 2012–Father had scheduled visitation at 12:00 p.m.; Mother arrived at 1:02

p.m. Father's visitation was supposed to end at 4:00 p.m.; Mother left with the child at 3:30 p.m.

- May 20, 2012– Mother arrived for 12:00 p.m. visitation at 12:36 p.m.
- May 24, 2012–Mother arrived for 12:00 p.m. visitation at 12:50 p.m.
- June 17, 2012–Mother arrived for 12:00 p.m. visitation at 12:35 p.m.
- June 24, 2012–Mother arrived for 12:00 p.m. visitation at 12:25 p.m.
- July 1, 2012– Mother arrived for 12:00 p.m. visitation at 1:15 p.m.
- July 8, 2012–Mother arrived for 12:00 p.m. visitation at 1:15 p.m.
- July 15, 2012–Father drove two hours for visitation; Mother failed to show up.
- July 22, 2012–Mother arrived at 1:20 p.m. for 12:00 p.m. visit
- July 29, 2012–Mother arrived at 1:16 p.m. for 12:00 p.m. visit
- August 12, 2012–Mother arrived at 2:15 p.m. for 12:00 p.m. visit
- August 19, 2012–Mother failed to show up for visitation
- September 9, 2012–Mother arrived at 1:07 p.m. for 12:00 p.m. visit
- September 16, 2012–Mother failed to show up for visitation; Father had driven two hours to get to location
- September 23, 2012– Father's visitation was scheduled for 12:00 p.m.; Mother arrived at 12:27 p.m.
- September 30, 2012–Mother arrived at 12:47 p.m. for 12:00 p.m. visit.
- October 14, 2012–Mother failed to show up for visitation, and did not tell Father. Father drove two hours for visitation.
- October 15, 2012–Mother did not show up for visitation, and did not inform Father
- October 21, 2012–Mother did not show up for visitation, and did not inform father
- October 27, 2012–Mother did not show up
- November 4, 2012–Mother arrived for 12:00 p.m. visit at 1:20 p.m.
- November 11, 2012–Mother did not show up
- November 18, 2012–Mother did not show up; Father waited the entire 4 hours, driving two-hours each way for the visit. Mother left a message on his voicemail at midnight to let him know that she would not be complying with the visitation.
- November 24, 2012–Mother called to cancel this visitation, but would not give Father a make-up day.
- December 16, 2012–Mother did not show up, and did not call.
- December 23, 2012–Mother did not show up for scheduled visitation.
- December 25, 2012–Father attempted to call the child; he left a voicemail on Mother's phone, but she did not return his call.
- March 10, 2013–Mother failed to show up for Father's visitation, and did not call.
- March 16, 2013–Father attempted to call the child on her birthday. Mother told him that the child was sleeping, and that she would call back. Mother did not return Father's call.

From March 11, 2012 through March 10, 2013, Father recounted at least 36 incidents where Mother was either late, or did not show up for visitation at all. Father testified that, when he was granted overnight visitation with the child (on May 2, 2013), Mother called his home several times to harass him (on one occasion, Father testified that she called at 1:00 a.m.). Concerning Mother's compliance with his overnight visitation schedule, Father further testified:

- May 10, 2013–Father was scheduled for a weekend visit to begin at 6:00 p.m.; Mother arrived at 6:33 p.m.. Mother's father was with her and, according to Father's testimony, he "jumped out of the[] vehicle and threatened [Father]."
- May 18, 2013–Father was scheduled for weekend visitation. He phoned Mother on May 18 and May 19 to make arrangements to pick up his daughter. Mother did not answer or return Father's calls.
- May 31, 2013–Father was scheduled for a weekend visit. Mother did not show up.
- June 21, 2013–Father's weekend visit was scheduled to begin at 6:00 p.m., and the parties were to meet at Exit 25 off Interstate 40. Mother did not show up.
- July 2, 2013–Father was scheduled for weekend visitation, and was scheduled to pick the child up at Mother's home. When Father arrived, Mother would not allow the child to go with him.
- September 5, 2013–Father was again scheduled to pick the child up from Mother's home for his weekend visit. Father arrived with his parents and the police, but was not able to pick the child up.

Both of Father's parents testified that they had accompanied Father on most of these scheduled visitation dates (the paternal grandmother accompanied Father to all of the visitations). Their respective testimonies corroborate Father's notes and his testimony. Mother disputed this testimony:

> Q [to Mother]. Now, we went through numerous examples of notes taken contemporaneously with the visits where [Father and his parents] all have testified that you were either an hour, hour and 15 minutes, hour and a half late, and we cited 50 examples. You're saying they're lying about that?
>
> A. They sure are.
>
> Q. You're saying that that's not true.
>
> A. It's not true.

19

Q.  Where are your notes?

A.  I don't have any notes . . . .

Clearly, from its statements and ruling, the trial court did not credit Mother's testimony.  It is well settled that when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See* ***id***.; *see also* ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

It is clear that the trial court's primary concern was Mother's interference with Father's visitation, and with her failure to promote the child's relationship with Father.  It is also clear from the record that Father very much wants a relationship with this child, and that he has done all in his power to secure that right.  Perhaps the testimony of Father's mother best summarizes Mother's attitude toward Father's visitation:

Q [to Father's mother].  Seeing what's happened between the parties and with visitations, do you believe [Mother] will grant your son any meaningful parenting time?

A.  No, I do not.  Not at all.

Q. Why do you believe that?

A.  Because her action[s] in the past have shown . . . that she's consistent in keeping the child away from [Father].  As a matter of fact, [Mother] stated that . . . if he ever broke up with her, that . . . she would punish him, and so she's fulfilling her promise.

Based upon the foregoing evidence, the trial court made the following finding from the bench:

It's clear to me, ma'am [i.e., Mother] that you do not have any desire or willingness to facilitate or encourage a relationship between your daughter and her father.  The evidence is more than clear from his contemporaneous notes and the testimony at trial

20

that you are doing everything you can to alienate [the child's] affections from her father.

In contrast, Father testified:

Q [to Father]: If the Court were to award you primary residential status or custody, would you try to see that the mother sees [the child]?

A. Yes.

Q. Would you try to see that [Mother] speaks with [the child] on a regular basis?

A. Yes.

Q. Why would you do that?

A. Because that would be the right thing to do.

From the totality of the circumstances, we conclude that this factor weighs heavily in favor of Father. Given Mother's failure to cooperate with Father concerning visitation, and her disregard of the court's orders on visitation, we conclude that the trial court's decision to award Father primary residential custody of the child was warranted and necessary to ensure that he has a relationship with her. Accordingly, we affirm the order of the trial court concerning custody and visitation.

### Attorney's Fees

Mother contends that the trial court erred in awarding Father his attorney's fees. Although the trial court's order does not specify its reason for awarding Father's fees, Tennessee Code Annotated Section 36-5-103(c) provides:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the

21

original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tennessee Code Annotated Section 36-5-103(c) gives a court the discretion to award attorney fees to the prevailing party, "in regard to any suit or action concerning the adjudication of custody or the change of custody of any child, or children of the parties[.]" *Id.*; *see also* ***Holt v. Holt***, 995 S.W.2d 68, 78 (Tenn.1999); ***Shofner v. Stewart***, 232 S.W.3d 36, 41 (Tenn. Ct. App. 2007); ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). Only the prevailing party, however, is entitled to recover attorney's fees. *See* ***In re M.L.D.***, 182 S.W.3d 890, 898 (Tenn. Ct. App. 2005). [added reported case]

In this case, Father has come before the trial court some eleven times in an attempt to secure his visitation rights. The trial court found that Mother has "consistently thwarted this Court's Order to prevent [Father] from having a connection with this child, and she's almost four years old." For the reasons discussed above, the record clearly supports this finding. Accordingly, we cannot conclude that the trial court abused its discretion in awarding Father his attorney's fees pursuant to Tennessee Code Annotated Section 36-5-103©.

In addition, both parties have asked this Court to award their respective attorney's fees and costs expended in prosecution and defense of this appeal. Under the foregoing statute, Father, as the prevailing party, may be awarded his attorney's fees and costs. Mother, as the losing party, is not entitled to her fees and costs. Accordingly, Mother's request for attorney's fees and costs is denied.

In exercising our discretion in determining whether to grant Father's request for attorney's fees and costs of the appeal, we should consider, *inter alia*, the "ability of the requesting party to pay his or her fees and costs, the requesting party's success on appeal, and whether the requesting party has been acting in good faith." ***Shofner v. Shofner***, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004) (quoting ***Parchman v. Parchman***, No. W2003-01204-COA-R3-CV, 2004 WL 2609198, at *6 (Tenn. Ct. App. Nov. 17, 2004).

From the record, it appears that both parties are gainfully employed. Mother testified that: (1) she has worked at Federal Express for six years; (2) she earns $12.26 per hour; (3) she works approximately 35 to 40 hours per week; (4) she works overtime three Sundays per month, which equals 20 to 24 hours of overtime per month. By her own testimony, Mother grosses approximately $2,192.79 per month. Despite her income, Mother filed an affidavit of indigency in the trial court. More surprising, the trial court granted Mother permission to proceed as a pauper in this appeal (by order of April 7, 2014).

On the other hand, Father testified and produced proof that his gross income is $1,138.19 per month. From her own testimony, Mother is in a better position to pay her own fees, as well as Father's. Additionally, Father is the prevailing party in this appeal. Furthermore, there is no indication that he has acted in bad faith at any time during these proceedings, or in the trial court. Mother's actions, however, have not been as conscientious. For the reasons discussed above, it is clear that the length of this litigation has been protracted due to Mother's continuing failure to abide by the court's orders. In light of Mother's failure to comply with Father's visitation, he has been forced to come to the court time and again in order to see his child. For these reasons, and from the totality of the circumstances, we exercise our discretion to award Father his reasonable attorney's fees and costs expended in defense of this appeal. The case is remanded to the trial court for determination of the amount of those fees and costs.

For the foregoing reasons, we affirm the order of the trial court, and award Father his attorney's fees and costs for this appeal. This cause is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion, including, but not limited to, calculation of Father's appellate attorney's fees and costs. Costs of this appeal are assessed to the Appellant Mother. Because Mother was allowed to proceed, *in forma pauperis*, in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE

23